**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TYLER BONSON,** | : | **Civil No. 1:19-CV-54** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **HANOVER FOODS** | : | |
| **CORPORATION, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.     INTRODUCTION

This case presents issues on the cutting edge of employment discrimination law relating to the extent to which federal law protects workers from acts of workplace discrimination based upon gender identification, perceived gender identification or hostility to an employee's failure to abide the employer's stereotypical views of gender roles. While the legal benchmarks which govern such claims are in flux, as discussed below we find that under current prevailing legal standards in this circuit disputed issues of fact regarding the conduct and motivation of the parties preclude summary judgment in this case.

Pending before the court is the defendants' motion for summary judgment. The plaintiff, Tyler Bonson, brought this action against his former employer,

1

Hanover Foods Corporation ("Hanover") and two supervisory employees, alleging that he was discriminated against, subjected to a hostile work environment, and eventually terminated from his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the related provisions of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951 *et seq.* Specifically, Bonson alleges that he was subjected to constant harassment from his supervisors based upon a stereotypical perception of his sexuality, and that this discriminatory sexual stereotyping was the reason he was terminated rather than an alleged violation of company policy.

For their part, the defendants contend that Bonson was not discriminated against or subjected to a hostile work environment, and that he was terminated for a violation of Hanover's single-absence attendance policy rather than for discriminatory reasons. However, after consideration, we find that the record is replete with disputes of material fact that preclude the entry of summary judgment in favor of the defendants. Accordingly, for the following reasons, we will deny the defendants' motion.

## II.    BACKGROUND

Tyler Bonson was employed by Hanover from 2008 until he was terminated in 2017, holding positions such as Inspector and Freezer Operator. (Doc. 1, ¶ 9; Doc.

20-3, at 128). Page Gaddis, the individual defendant,[1] was one of Bonson's supervisors, as well as the Human Resources representative for Hanover. (Doc. 1, ¶ 11). According to Bonson, during his employment with Hanover, Gaddis harassed him by constantly calling him derogatory names such as "queer," "fag," and "fairy," due to the way Bonson kept himself in comparison to the other employees at Hanover. (Doc. 20-3, at 133). Gaddis also told other employees that the plaintiff was gay and told Bonson that his car looked like "something a queer would drive." (Id., at 124). Although Bonson never made a formal complaint to HR, given that Gaddis was the HR representative, he did tell Gaddis on numerous occasions to stop calling him names and to leave him alone. (Id., at 121-24, 133-36).

He also testified that one of his supervisors, Robert Smoyer, called him these names as well, and that he felt he couldn't report the behavior because these individuals were his supervisors. (Id., at 133, 140). For their part, the defendants dispute that Gaddis and Smoyer harassed the plaintiff in this way. To the contrary, Gaddis stated that he never called Bonson any of these names or harassed him in any way. (Id., at 29). Robert Smoyer, Jr. also testified that he didn't call Bonson names and never heard Gaddis call Bonson or anyone else by these names. (Id., at 62). Thus, at the outset, there is a sharply defined dispute of facts between the parties

---

[1] While Bonson initially brought this action against Hanover and two of his supervisors, the claims against Robert Smoyer, Jr., individually, have been dismissed. (Doc. 14).

regarding whether Bonson was subjected to a series of derogatory gender identification stereotypes by supervisory and HR personnel

On September 4, 2017, Labor Day, Bonson did not show up for work. (Id., at 144). According to Bonson, he was told by Smoyer that work on that day was discretionary and that Bonson could work if he needed the hours. (Id., at 143). Bonson claims that he informed Smoyer on September 1 that he would not be working on September 4. (Id.) However, Gaddis and Smoyer stated that Bonson did not actually inform anyone that he would be absent on Labor Day, thus defining another material factual dispute in this case. (Id., at 35, 57). The next day, September 5, 2017, Gaddis terminated Bonson's employment. (Doc. 1, ¶ 22). Gaddis claimed that the termination was warranted under Hanover's one-time, no call/no show absence policy, wherein an employee could be terminated for failing to show up for work on one occasion without calling and informing a supervisor of their absence. (Doc. 20-3, at 27, 251). Bonson claims that on the day he was terminated, as well as three weeks before his termination, Gaddis again harassed him and called him derogatory names and Bonson told him to stop. (Id., at 124, 137, 144).

The following day, Bonson filed a grievance with the workers' union concerning his termination. (Id., at 157). Bonson did not mention Gaddis' harassment in his grievance. (Id., at 157-58). His grievance was denied by Gaddis at the initial stage, and the grievance ultimately went to arbitration. (Id., at 251).

Bonson claimed that he mentioned Gaddis' behavior toward him at the arbitration but it was not considered. (Id., at 158).

Thus, after filing a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), Bonson received his Right-to-Sue letter and filed the complaint in the instant action on January 9, 2019. (Doc. 1). In his complaint, Bonson asserted claims of discrimination and disparate treatment, hostile work environment, and retaliation in violation of Title VII and the PHRA against Hanover, Smoyer, and Gaddis. (Id.) Thereafter, Bonson stipulated to dismissal of the individual claims against Smoyer. (Doc. 14). Thus, the remaining claims in this case are discrimination, harassment, and retaliation against Hanover and Gaddis.

On January 31, 2020, the defendants filed the instant motion for summary judgment. (Doc. 17). This motion raises a threshold legal issue regarding the scope of the workplace protections afforded under federal law since the defendants assert that Bonson cannot show that he was part of a protected class, and thus cannot prevail on his Title VII and PHRA claims. Moreover, they claim that even if Bonson was part of a protected class, he cannot show that his termination was for a discriminatory reason, rather than a violation of company policy. However, after a review of the record, we find that Bonson's claims fall within the reach of federal law and this case is marked by two starkly contrasting factual narratives that will

likely turn on a credibility assessment of the parties. Accordingly, because that credibility assessment is reserved for a jury rather than the Court, we will deny the instant motion for summary judgment.

### III.  STANDARD OF REVIEW

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment, a court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law." Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 271 (3d Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). A disputed issue is only "genuine" if there is a sufficient evidentiary basis upon which a reasonable factfinder could find for the non-moving party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A factual dispute is "material" only if it could affect the outcome of the suit under the governing law. Doe v. Luzerne Cnty., 660 F.3d 169, 175 (3d Cir. 2011) (citing Gray v. York Papers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)).  The Court is not tasked with resolving disputed issues of fact, but only with

determining whether there exist any factual issues that must be tried. <u>Anderson</u>, 477 U.S. at 247-49.

In considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. <u>Macfarlan</u>, 675 F.3d at 271; <u>Bouriez v. Carnegie Mellon Univ.</u>, 585 F.3d 765, 770 (3d Cir. 2009). Where there exist factual issues that cannot be resolved without a credibility determination, the court must credit the non-moving party's evidence over that presented by the moving party. <u>Liberty Lobby</u>, 477 U.S. at 255. However, if there is no factual issue presented, and if only one reasonable conclusion could arise from the record with respect to the potential outcome under the governing law, the court must award summary judgment in favor of the moving party. <u>Id.</u> at 250.

The court must review the entire record, but in doing so must take care to "disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Reeves v. Sanderson Plumbing Products</u>, 530 U.S. 133, 150-51 (2000). The task for the court is to examine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251-52. In considering this evidence, we note that "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment." <u>Paladino v. Newsome</u>, 885 F.3d

203, 209 n. 34 (3d Cir. 2018) (quoting <u>Lupyan v. Corinthian Colleges, Inc.</u>, 761 F.3d

314, 320 (3d Cir. 2014)). This principle of the rules governing summary judgment

holds true "even where . . . the information is self-serving." <u>Id.</u> (citing <u>Lupyan</u>, 761

F.3d at 321 n.2).

**IV.** **DISCUSSION**

As we have explained, the plaintiff asserts claims against the defendants

pursuant to Title VII and the PHRA, alleging that he was discriminated against,

subjected to a hostile work environment, and ultimately terminated for

discriminatory reasons. Bonson claims that his supervisors, Page Gaddis and Robert

Smoyer, Jr., called him offensive names based upon their perceived and stereotypical

gender identification of the plaintiff on a regular basis because of the way he dressed,

smelled, and kept himself compared to his coworkers. He then claims that Gaddis

terminated his employment when Bonson did not show up to work on Labor Day,

although Bonson claims that he was not required to work that day.

For their part, the defendants assert that Bonson cannot show that he was

discriminated against or subjected to a hostile work environment because he does

not allege that he is part of a protected class. Moreover, they contend that Bonson

was terminated solely for his failure to show up at work on Labor Day in violation

of Hanover's no call/no show termination policy. However, as we will discuss

below, this case is replete with factual disputes concerning all of the plaintiff's claims. Accordingly, we will deny the defendants' summary judgment motion.

## A. **Title VII Standards of Review[2]**

At the outset, we recognize that while Bonson's complaint alleges discrimination on the basis of "gender identity," the facts alleged in his complaint, when viewed in a light most favorable to Bonson, support a claim for discrimination based on the failure to adhere to gender stereotypes.[3] Thus, Bonson alleges that he was discriminated against and called names associated with homosexuality because

---

[2] "Generally speaking, the Pennsylvania courts construe the parallel provisions of the PHRA to be coextensive with their federal counterparts. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Stultz v. Reese Bros., Inc., 835 A.2d 754, 759 (Pa. Super. Ct. 2003). The PHRA should be interpreted 'as identical to federal anti-discrimination laws except where there is something specifically different in its language' justifying a different construction. Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002)." Prise v. Alderwoods Grp., Inc., 657 F. Supp. 2d 564, 586 (W.D. Pa. 2009). Therefore, we will apply the same legal guideposts when evaluating the sufficiency of these parallel state and federal workplace discrimination and retaliation claims.

[3] We note that to the extent Bonson is claiming discrimination based on sexual orientation or perceived sexual orientation, the Third Circuit has explicitly held that discrimination based on sexual orientation is not prohibited by Title VII, Bibby v. Phila. Coca Cola Bottling Co., 260 F.3d 257, 261 (3d Cir. 2001) ("It is clear, however, that Title VII does not prohibit discrimination based on sexual orientation"), a question which is under consideration by the United States Supreme Court. Altitude Exp., Inc. v. Zarda, 139 S. Ct. 1599, 203 L. Ed. 2d 754 (2019).There remains, however, an established Title VII cause of action for bias based upon gender stereotyping and hostility to those who fail to abide by these stereotypes.

of the way he dressed, smelled, and kept himself in comparison to his coworkers and supervisors, mannerisms which did not conform to gender stereotypes.

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against and/or discharging their employees because of their sex. 42 U.S.C. § 2000e-2(a)(1). Title VII discrimination claims are governed by a burden-shifting framework. See Jones v. Southeastern Pa. Transp. Auth., 796 F.3d 323, 325-26 (3d Cir. 2015). In brief, that framework requires that the plaintiff demonstrate that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) under circumstances that give rise to an inference of unlawful sex-based discrimination. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). The last element also requires that the plaintiff demonstrate a causal connection between his protected status and the allegedly adverse action. Id. at 798. The key focus of the *prima facie* test is "always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" Id. (citation omitted). The elements of the *prima facie* case "must not be applied woodenly but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." Geraci v. Moody-Tottrup Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996).

The Court of Appeals for the Third Circuit has held that discrimination "because of sex" includes a claim that an employee was discriminated against

because of his failure to adhere to or comply with gender stereotypes. Bibby v. Phila. Coca Cola Bottling Co., 260 F.3d 257 (3d Cir. 2001). In Bibby, the Court relied on Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), to hold that "a plaintiff may be able to prove that same-sex harassment was discrimination because of sex by presenting evidence that the harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender." Bibby, 260 F.3d at 262-63. However, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.'" Id. at 264 (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)).

Moreover, " 'a plaintiff may establish that an employer has violated Title VII by proving that discrimination based on sex created a hostile or abusive work environment.' " Jones, 796 F.3d at 328 (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986)). In order to do so, a plaintiff must make a *prima facie* showing that: "(1) []he suffered intentional discrimination because of h[is] sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected h[im], (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of *respondeat superior* liability." Bumbarger v. New Enterprise Stone and Lime Co., Inc., 170 F.Supp.3d

801, 826 (E.D. Pa. 2016) (quoting Martinez v. Rapidigm, Inc., 290 F. App'x 521, 524 (3d Cir. 2008) (internal quotation marks omitted)).

Finally, Title VII contains a retaliation provision, under which a plaintiff must show that "(1) []he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against h[im]; and (3) there was a causal connection between h[is] participation in the protected activity and the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." Moore, 461 F.3d at 341 (citing Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006)). Regardless of the distinction between the two theories of retaliation, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." Id. (citing Clark County v. Breeden, 532 U.S. 268, 271 (2001) (per curiam)).

A plaintiff alleging Title VII retaliation must show that a reasonable employee would have found the allegedly retaliatory action "materially adverse" in that the conduct "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Moore, 461 F.3d at 341. A plaintiff must also show a

causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have discouraged a reasonable employee from making or supporting a charge of discrimination. "Many may suffer ... harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006). This third element "identif[ies] what harassment, if any, a reasonable jury could link to retaliatory animus." Id. at 449-50. "The ultimate question in any retaliation case is an intent to retaliate vel non." Id. at 449 n.2. If the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct, and if the employer does so "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore, 461 F.3d at 342 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997)).

**B. <u>There are Genuine Disputes of Material Fact that Preclude Summary Judgment on the Plaintiff's Claims.</u>**

Here, Bonson brings both a hostile work environment and retaliation claim against Hanover and Gaddis, claiming that Gaddis subjected him to constant harassment and eventually terminated his employment for discriminatory reasons. While his claims are cast in somewhat broad terms, we find that Bonson has alleged

that he was subjected to harassment and discrimination because of sex by presenting evidence that the harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender. Bibby, 260 F.3d at 262-63. Further, in our view, there is evidence in the record from which a factfinder could conclude that Hanover and Gaddis violated Title VII and the PHRA by discriminating against Bonson because they found that he did not conform to gender stereotypes and ultimately terminated his employment after he complained about their use of derogatory terms based upon their perception of his gender identification, a perceived gender identification that did not comport with their stereotypical norms.

### 1. Discrimination and Hostile Work Environment

First, with respect to the discrimination claim, there is no dispute that Bonson suffered an adverse employment action because he was terminated on September 5, 2017. Moreover, Bonson has produced evidence that he is part of a protected class, and that the circumstances surrounding his termination permit an inference of discrimination. Indeed, while his complaint references discrimination based on "gender identity," when viewing the record in a light most favorable to Bonson, which we must at the summary judgment stage, there is evidence from which a factfinder could conclude that Bonson was discriminated against for his failure to conform to gender stereotypes. On this score, Bonson stated in his complaint that he believed Gaddis and Smoyer called him derogatory names and told people that he

was gay because he has "good hygiene, combed his hair, and smelled good." (Doc. 1, ¶ 14). Further, Bonson stated that Gaddis referred to Bonson's car as "something a queer would drive." (Doc 20-3, at 124). Additionally, Bonson's mother, Lisa, who also worked at Hanover, stated that the majority of the employees at Hanover were "slobs," and she believed that they were envious of Tyler Bonson's hygiene and looks. (Doc. 20-3, at 70). Thus, a factfinder could conclude from this evidence that Gaddis treated Bonson this way and called him these names because Bonson did not conform to Gaddis' idea of gender stereotypes. See Johnston v. Univ. of Pittsburgh of Com. System of Higher Education, 97 F.Supp.3d 657, 680 (W.D. Pa. 2015) (noting that "[s]ex stereotyping claims are based on behaviors, mannerisms, and appearances").

Moreover, the circumstances permit an inference of discrimination because of Bonson's sex or failure to adhere to gender stereotypes. Bonson testified that on the day Gaddis terminated his employment, as well as three weeks prior to his termination, Gaddis had continued to call him derogatory names based upon a stereotypical view of his perceived sexuality. (Id., at 133, 136, 138). Moreover, both Bonson and James Laing testified that other employees who were "no call/no shows" were not terminated after one absence. (Id., at 84, 123). Thus, while Gaddis disputes this and contends that he never called Bonson derogatory names or treated him differently, we find that the evidence in the record, when viewed in a light most

favorable to Bonson, could permit a factfinder to conclude that Gaddis discriminated against Bonson and terminated him because of Bonson's failure to adhere to Gaddis' idea of gender stereotypes. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) (finding that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation").

Further, the evidence supports Bonson's claim of a hostile work environment. On this score, as we have explained above, Bonson has shown that he suffered intentional discrimination because of his failure to comport with these gender stereotypes. Additionally, it is undisputed that there is *respondeat superior* liability, as Gaddis and Smoyer were both Bonson's supervisors at Hanover.

Moreover, the record indicates that the harassment was severe or pervasive. The Third Circuit has stated that a court must consider the totality of the circumstances in determining whether conduct was severe or pervasive, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." Castleberry v. STI Group, 863 F.3d 259, 264 (3d Cir. 2017) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, (1993)). Under this standard, a single incident can be found to be "severe" if it is extreme enough to alter the victim's conditions of employment. Id. at 264-65. Additionally, less objectionable conduct can be considered "pervasive"

even if not severe, so long as it permeates the workplace in a way which alters the employee's conditions of employment. Id. at 264.

In the instant case, we find that the record could support a conclusion that the conduct of Gaddis and Smoyer amounted to severe or pervasive conduct in violation of Title VII. While both Gaddis and Smoyer deny that they harassed Bonson in any way, Bonson claims that both of these supervisory employees called him derogatory names such as "freezer fairy," "fag," and "queer" on a regular basis throughout his employment at Hanover. (Doc. 20-3, at 123-24, 133, 138-39, 144). According to Bonson, Gaddis would refer to him as a "queer" and tell other employees at Hanover that Bonson was gay. (Id., at 124). Bonson claims that this occurred several times per week. (Id., at 133). Bonson also asserts that Smoyer referred to him as a "queer" or "fag" on many occasions. (Id., at 123-24). He claims that other employees at Hanover witnessed these supervisors call Bonson these names. (Id., at 111, 134). In addition, Lisa Bonson, Tyler's mother, testified that Gaddis asked her how her "gay son" was doing. (Id., at 70). Thus, in our view, the discriminatory conduct meets the definition of pervasive because it indeed permeated the workplace, as evidenced by the fact that several Hanover employees testified to their knowledge of it.

The conduct at issue also detrimentally affected Bonson and would likely affect a reasonable person of the same sex in similar circumstances. While the defendants point to Bonson's deposition, wherein Bonson concedes that his work

performance was not affected, this is not the standard under Title VII. Rather, the

Supreme Court has stated that:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality. The appalling conduct alleged in <u>Meritor</u>, and the reference in that case to environments " 'so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers,' " <u>id.</u>, at 66, 106 S.Ct., at 2405, quoting <u>Rogers v. EEOC</u>, 454 F.2d 234, 238 (CA5 1971), <u>cert. denied</u>, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.

<u>Harris</u>, 510 U.S. at 370-71.

On this score, we think there is sufficient evidence in the record to show that

Bonson was detrimentally affected by the harassment. In his deposition, Bonson

stated that while the harassment did not necessarily affect his work performance, it

caused him to shelter himself while he was at work in an effort to avoid the people

who were harassing him. (Doc. 20-3, at 142). He also stated that he felt he was

denied promotional opportunities, specifically a second-shift supervisor position,

because of the way his supervisors treated him. (<u>Id.</u>, at 143). Thus, Bonson obviously

perceived the conduct to be subjectively hostile. Moreover, given the evidence

presented by Bonson and viewing that evidence in a light favorable to him, we find that a reasonable person in similar circumstances would likely be detrimentally affected by the conduct. See Briggs v. Temple Univ., 339 F.Supp.3d 466, 504 (E.D. Pa. 2018) (finding that the plaintiff's evidence demonstrated she subjectively perceived the harassment as hostile and was detrimentally affected by it, and thus a reasonable person in her position would have likely been similarly detrimentally affected).

Because Bonson has produced evidence showing that he was discriminated against and subjected to a hostile work environment, the burden now shifts to Hanover to show that there was a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. On this score, Hanover claims that Bonson was terminated pursuant to its no call/no show policy. As we have acknowledged, Hanover had implemented a one-time, no call/no show policy, wherein an employee could be terminated for failing to show up to work if he did not notify a supervisor of his absence. In addition, Bonson concedes that he did not show up to work on September 4, 2017. Thus, Hanover has met its burden to set forth a legitimate nondiscriminatory reason for Bonson's termination.

However, we find that there is sufficient evidence in the record from which a factfinder could conclude that the reason advanced by Hanover is a pretext for discrimination. On this score, the Third Circuit has held that "[t]o establish pretext,

Appellants must 'point to some evidence ... from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating ... cause of the employer's action.'" Stites v. Alan Richey, Inc., 458 F. App'x 110, 112 (3d Cir. 2012) (quoting Iadimarco v. Runyon, 190 F.3d 151, 165–66 (3d Cir. 1999)). Here, Bonson stated that he informed Smoyer on Friday, September 1, that he would not be working on Monday, September 4. (Doc. 20-3, at 143). Bonson claims that Smoyer told him he *could* come into work on Monday, but that he was not *required* to. (Id.) Smoyer disputes Bonson's version of events, asserting that Bonson was scheduled to work on September 4 and never informed Smoyer that he would not be coming into work that day. (Id., at 57). However, Bonson also asserts that there were other employees who were no call/no shows and were not terminated pursuant to Hanover's absence policy. (Id., at 141). Moreover, there seems to be a dispute concerning how the Freezer Department was scheduled and what the call-off procedure was. (Id., at 57, 145). As we have explained, the resolution of these distinct factual narratives will turn on a credibility assessment of the parties, an assessment that is reserved for the trier of fact.

Accordingly, because we find that a reasonable juror could conclude that Bonson was discriminated against and subjected to a hostile work environment because of his apparent failure to conform to certain gender stereotypes, and because

we find that Bonson has produced sufficient evidence to show that Hanover's reason for his termination was pretextual, we will deny the defendants' motion for summary judgment on those claims.

## 2. **Retaliation**

Finally, Bonson asserts a retaliation claim against Hanover and Gaddis, claiming that he opposed Gaddis' harassment and conduct and was ultimately terminated because of his complaints. As we have explained, in order to state a *prima facie* case of retaliation under Title VII, Bonson must show that he engaged in protected activity, such as opposing unlawful conduct, that he suffered an adverse employment action, and that there is a causal connection between the protected activity and adverse action. Moore, 461 F.3d at 340-41. Here, it is undisputed that Bonson suffered an adverse employment action because his employment was terminated on September 5, 2017.

With respect to the first element, the defendants contend that Bonson has not shown he engaged in protected activity because he never filed a complaint with HR or spoke to an HR representative about the alleged harassment. However, it is clear that "protected activity" under Title VII "extends beyond formal complaints . . . and can include 'informal protests of discriminatory employment practices, [such as] making complaints to management. . . .'" Mikell v. Marriott Intern, Inc., 789 F.Supp.2d 607, 618 (E.D. Pa. 2011) (quoting Curay–Cramer v. Ursuline Acad. of

Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)); see also Collins v. Kimberly-Clark Pennsylvania, LLC, 247 F.Supp.3d 571, 599 (E.D. Pa. 2017). Indeed, all that is required is that the complaint is "specific enough to notify management of the particular type of discrimination at issue in order to constitute 'protected activity.'" Sanchez v. SunGard Availability Servs. LP, 362 F. App'x 283, 288 (3d Cir. 2010). As the Supreme Court has recognized, "[w]hen an employee communicates to h[is] employer a belief that the employer has engaged in ... a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." Crawford v. Metro Gov't of Nashville and Davidson County, Tennesee, 555 U.S. 271, 276 (2009).

Here, although Bonson admits that he never made a formal complaint to the HR department, Bonson's HR representative at Hanover was Page Gaddis—the supervisor who was the person allegedly harassing him. Moreover, construing the evidence in a light most favorable to Bonson, as we are required to do, Bonson did make informal complaints to Gaddis when he repeatedly opposed Gaddis' behavior and told him to stop. Accordingly, in our view, there is sufficient evidence that Bonson opposed an unlawful practice to satisfy this element of his *prima facie* case of retaliation.

Further, Bonson has presented evidence from which a factfinder could conclude his termination was causally connected to his protected activity. The Third

Circuit has instructed that in cases where the temporal proximity between the protected activity and adverse action is "unusually suggestive," this timing alone can be sufficient to establish a *prima facie* case of retaliation. LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 231 (3d Cir. 2007). In cases in which the temporal proximity is not unusually suggestive, "we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" Id. (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)).

Here, Bonson claimed that on the day he was terminated, just hours prior to Gaddis terminating his employment, Gaddis asked him, "[W]here were you yesterday, faggot?" (Doc. 20-3, at 144). Bonson responded, telling Gaddis to "knock it off." (Id., at 137). In addition, Bonson stated that about three weeks prior to his termination, Gaddis approached him at the time clock, called him a "queer," and told him his car was "something a queer would drive." (Id., at 124). In response, Bonson responded that he was "not f***ing queer" and told Gaddis to "knock it the f*** off." (Id.) In our view, these instances and their temporal proximity to Bonson's termination—specifically the incident on the day he was terminated—are sufficient to establish at *prima facie* case of retaliation under Title VII. Moreover, even if the temporal proximity was not "unusually suggestive," a factfinder could infer from looking at the evidence as a whole that Bonson's termination was causally connected to his protected activity.

As we have explained with respect to Bonson's hostile work environment claim, although Hanover has proffered a legitimate, nondiscriminatory reason for Bonson's employment, Bonson has set forth evidence from which a jury could conclude this reason was a pretext for discrimination. Accordingly, we will deny the defendants' motion for summary judgment on the retaliation claim.

**V.      CONCLUSION**

Accordingly, for the foregoing reasons, we will DENY the defendants' motion for summary judgment.

An appropriate order follows.


*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TYLER BONSON,** | : | **Civil No. 1:19-CV-54** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **HANOVER FOOD** | : | |
| **CORPORATION, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

AND NOW, this 1st day of April 2020, in accordance with the accompanying Memorandum Opinion, IT IS HEREBY ORDERED THAT the defendants' motion for summary judgment (Doc. 17) is DENIED. IT IS FURTHER ORDERED that on or before **April 27, 2020**, the parties shall consult, confer and either: (1) notify the court regarding whether they wish to pursue mediation; or (2) provide the court with a proposed case management plan prescribing a schedule for the trial of this case.

/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge